THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHN DOE I, JOHN DOE II, JOHN DOE III, | § | CIVIL ACTION NO. _____ |
| JOHN DOE IV, JOHN DOE V | § | |
| | § | |
| VS. | § | |
| | § | |
| HOLY SEE (Vatican City State), | § | |
| THE ROMAN CATHOLIC CHURCH OF THE | § | |
| ARCHDIOCESE OF NEW ORLEANS, | § | |
| MOST REV. GREGORY M. AYMOND, | § | |
| HIS PREDECESSORS AND SUCCESSORS, | § | |
| AS ARCHBISHOP OF THE ROMAN | § | |
| CATHOLIC CHURCH OF THE | § | |
| ARCHDIOCESE OF NEW ORLEANS, | § | |
| THE SOCIETY OF THE ROMAN | § | |
| CATHOLIC CHURCH OF THE | § | SECTION _____ |
| DIOCESE OF LAFAYETTE, | § | |
| MOST REV. J. DOUGLAS DESHOTEL, DD, | § | |
| HIS PREDECESSORS AND SUCCESSORS, | § | |
| AS BISHOP OF THE ROMAN | § | |
| CATHOLIC DIOCESE OF LAFAYETTE | § | MAGISTRATE _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW JOHN DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV and JOHN

DOE V (collectively referred to as "Plaintiffs") and file this Original Complaint against HOLY SEE

(Vatican City State), THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW

ORLEANS, MOST REV. GREGORY M. AYMOND, HIS PREDECESSORS AND

SUCCESSORS, AS ARCHBISHOP OF THE ROMAN CATHOLIC CHURCH OF THE

ARCHDIOCESE OF NEW ORLEANS, THE SOCIETY OF THE ROMAN CATHOLIC CHURCH

OF THE DIOCESE OF LAFAYETTE, MOST REV. J. DOUGLAS DESHOTEL, DD, HIS

PREDECESSORS AND SUCCESSORS, AS BISHOP OF THE ROMAN CATHOLIC DIOCESE

OF LAFAYETTE (collectively, referred to as "Defendants") for cause of action would show the following:

## I.  JURISDICTION and VENUE

1.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1330 (a) because Defendant Holy See is a foreign state not entitled to immunity under 28 U.S.C. §§ 1604-1607.

2.      This Court has jurisdiction over Defendant Holy See under 28 U.S.C. § 1605(a) because Plaintiff complains of both the private activities and conduct of Holy See in Louisiana and throughout the U.S.A. and torts committed by Holy See, its officials and employees in Louisiana.

3.      Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Louisiana.

## II.  PARTIES

4.      Plaintiff John Doe I is a resident of Lafayette Parish, Louisiana.

5.      Plaintiff John Doe II is a resident of St. Martin Parish, Louisiana.

6.      Plaintiff John Doe III is a resident of Boward County, Florida.

7.      Plaintiff John Doe IV is a resident of Will County, Illinois.

8.      Plaintiff John Doe V is a resident of St. Martin Parish, Louisiana.

9.      Defendant Holy See (Vatican City State) is the sovereign nation located in Rome, Italy and the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church. Holy See may be served with process by and through its Secretary for Relations with States (Foreign Minister), Archbishop Paul Gallagher, Apostolic Palace 00120 Vatican City State.

10.      Defendant The Roman Catholic Church of the Archdiocese of New Orleans

2

(hereinafter "The New Orleans Archdiocese" or the "Archdiocese"), is a registered Louisiana corporation and a division of Defendant Holy See's business and private enterprise. The Archdiocese is the center of control and oversight for the ecclesiastical territory of the Province of New Orleans that includes the states of Louisiana, Alabama, Mississippi, the western part of Florida and Arkansas. The Archdiocese has control and oversight for all of the dioceses and seminaries created by the Holy See within the Province of New Orleans, including the Diocese of Lafayette, Saint Joseph Seminary College in St. Benedict, Louisiana and St. John's Home Missions Seminary in Little Rock, Arkansas. The governing official of The New Orleans Archdiocese is the Archbishop of The New Orleans Archdiocese who is duly appointed, authorized and employed by Defendant Holy See to govern and control the Province of New Orleans and all the dioceses, archdioceses and seminaries created by the Holy See within the Province of New Orleans, to include the New Orleans Archdiocese, the Diocese of Lafayette, Saint Joseph Seminary College in St. Benedict, Louisiana, and St. John's Home Missions Seminary in Little Rock, Arkansas. The New Orleans Archdiocese may be served with process by and through its registered agent, Jeffrey J. Entwisle, 7887 Walmsley Avenue, New Orleans, Louisiana 70125.

11. Defendant Most Rev. Gregory M. Aymond, is the current Archbishop of the New Orleans Archdiocese (hereinafter "Archbishop Aymond"). Archbishop Aymond is duly appointed, employed and authorized by Defendant Holy See to oversee and control both a division (The New Orleans Archdiocese) and an ecclesiastical province of district dioceses and seminaries (Province of New Orleans), all within the Holy See's business and private enterprise. Archbishop Aymond is Defendant Holy See's governing official of the Archdiocese and the district dioceses and seminaries located within the ecclesiastical Province of New Orleans, to include the Diocese of Lafayette, Saint

3

Joseph Seminary College in St. Benedict, Louisiana, and St. John's Home Missions Seminary in Little Rock, Arkansas. Most Rev. Aymond is a resident of Louisiana and can be served with process at 7887 Walmsley Avenue, New Orleans, Louisiana 70125.

12.     Defendant The Society of the Roman Catholic Church of the Diocese of Lafayette is a registered Louisiana corporation and a district diocese within Defendant Holy See's business and private enterprise more commonly known as "The Diocese of Lafayette." The Diocese of Lafayette is established in the Holy See's ecclesiastical territory of the Province of New Orleans under the direct control and oversight of The New Orleans Archdiocese and The Archbishop of The New Orleans Archdiocese. The Diocese of Lafayette may be served with process by and through its registered agent, Deacon Jeff Trumps, 1408 Carmel Drive, Lafayette, Louisiana 70501.

13.     Defendant Most Rev. J. Douglas Deshotel, DD is currently duly appointed by Defendant Holy See to the office of the Bishop as the governing official of The Diocese of Lafayette (hereinafter "Bishop Deshotel"). As Bishop of The Diocese of Lafayette, Bishop Deshotel is employed and authorized by Defendant Holy See to govern and control the Diocese of Lafayette. The Most Rev. Deshotel is a resident of Louisiana and may be served with process at 1408 Carmel Drive, Lafayette, Louisiana 70501.

### III.  FACTUAL BACKGROUND

14.     At all times material herein, Monsignor Father Kenneth Romain Morvant, buried in December 2003 on the grounds of St. Martin of Tours Church, St. Martinville, Louisiana, a parish within Defendants Diocese of Lafayette and The New Orleans Archdiocese, was a Roman Catholic seminarian educated, trained and certified for a vocation in the priesthood by Defendants Holy See and The Roman Catholic Church of the Archdiocese of New Orleans and under their direct

supervision, authority and control, particularly on the issue of child sex abuse.  At all times material herein, Monsignor Father Kenneth Romain Morvant ("Monsignor Morvant" or "Father Morvant" or "Morvant") was a priest and pastor, minister and counselor employed by Defendant The Society of the Roman Catholic Church of the Diocese of Lafayette, under its direct supervision, authority and control, particularly on the issue of child sex abuse.

15.     Defendant Holy See is a sovereign nation and enters into treaties and conventions with other foreign states, including but not limited to the Universal Declaration of Human Rights and the Convention on the Rights of the Child.  Holy See maintains diplomatic relations with other foreign states, including the United States, and has observer status in the United Nations.  Defendant Holy See occupies its own sovereign territory located within the city of Rome, Italy.

16.     Defendant Holy See is a traditional monarchy where it holds all authority in the first instance and any authority held by others within the institution is delegated from the Holy See.  The Holy See has reaffirmed this in its book of rules and regulations, the Code of Canon Law: "The Roman Pontiff ... has not only primacy of honor, but supreme and full power of jurisdiction over the universal Church both in those things that pertain to faith and morals, and in those things that affect the discipline and government of the Church." (Canon 218 from the 1917 Code)

17.     Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his delegated advisors and/or agents to direct the activities and business of the world-wide Roman Catholic Church.  Defendant Holy See has unqualified power and control over the Catholic Church, including each and every individual and section of the church, including but not limited to all clerics and priests, bishops, archbishops, and cardinals, and all other church workers, as well as the ecclesiastical provinces, dioceses, and archdioceses and seminaries.

18.     Defendant Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization, and its employees for the purpose of the business, foreign affairs, and employees of the world-wide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics world-wide in exchange for all or a portion of the revenues collected from its members.  The Holy See engages in these activities through its agents who work under the authority of the Holy See —namely the cardinals, archbishops, bishops, and clergy of the Roman Catholic Church.

19.     Defendant Holy See has complete and total control, including day to day control, over each aspect of the Catholic Church.  To the extent that some of the entities underneath the Holy See's absolute control are separate corporations, e.g., Defendants Archdiocese and Diocese,  Defendant Holy See maintains complete and final control over these separate corporations.  The Holy See directs and requires each of these entities to strictly follow all of its policies and procedures, report its activities to the Holy See, and requires each cleric employed with the separate corporation to swear absolute obedience to the Holy See.  Defendant Holy See is the only entity that can create or terminate these corporations and Holy See has day to day control of these entities through mandatory policies and procedures, mandatory meetings, and mandatory obedience.  Any corporations, including Defendants Archdiocese and Diocese, were and are an alter ego of the Holy See.

20.     With respect to the issue of child sex abuse, the Holy See demands complete and unwavering obedience regarding procedures, the scope of potential penalties, and how each case will be disposed of ultimately.  Additionally, Defendant Holy See determined that it would require some of the entities under its control to incorporate in order to reduce the Holy See's exposure to claims by people who the Holy See has harmed and in order to keep the public from discovering the Holy

See's involvement in the systematic cover-up and concealment of child sex abuse by its agents.

21.     Defendant Holy See's organizational structure and chain of command mandate that the Holy See and its head of state, the Pope, have a significantly high level of involvement in the routine and day-to-day activities of its agents, cardinals, archbishops, bishops, clergy and instrumentalities, particularly with respect to the handling of clergy who have engaged in certain specified conduct, including child sex abuse.  By virtue of his office, the Pope, as head of the Holy See, possesses supreme, full, immediate and universal ordinary power in the Catholic Church, which he is always able to exercise freely.  There is no appeal of a decision of the Pope as head of the Holy See.

22.     Defendant Holy See is solely responsible for creating new divisions of its business enterprises and private activities (called an "ecclesiastical province" or "diocese" or "archdiocese") around the world.  Only the Holy See has this power.  Holy See creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces.  Defendant Holy See created the ecclesiastical province that includes the state of Louisiana and all the dioceses and archdioceses located within Louisiana, including The Province of New Orleans -formed in 1850, The Diocese of Lafayette -founded in January 1918, and The New Orleans Archdiocese -established in 1793.  Holy See is solely responsible for any modifications or elimination of the divisions and districts of its business enterprise.

23.     Defendant Holy See interacts with its local divisions and districts (its ecclesiastical provinces and dioceses and archdioceses) and employees in the United States and elsewhere in a manner that controls their day-to-day operations and provides for no discretion on numerous issues, and in particular the handling of child sex abuse by clergy and the determinations on whether clergy remain in the Roman Catholic ministry.  Defendant Holy See requires its duly appointed employees,

7

including those cardinals and archbishops and bishops in the United States in charge of the local operations of the Roman Catholic ministry, to make "Ad Limina" visits to Rome and to write detailed "quinquennial reports" about the state of the Roman Catholic ministry, including but not limited to personnel issues, finances and real estate holdings. Defendant Holy See further requires information on the source of the income of pastors and their supervisors, i.e., whether it is from real estate, public funds, an uncertified sum accruing through individual stole fees, or from a contribution made by the Catholic faithful or by the diocese.

24.     The Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements. Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for the clergy who serve in the educational and pastoral workings of the world-wide Catholic Church. The "proper and exclusive right" to train those destined for the sacred ministries in the Catholic Church is affirmed in Holy See's Code of Canon Law. (Canon 232 from the 1983 Code) The training of sacred ministers as a private activity of the Holy See was decreed by the Council of Trent (1563) to take place in seminaries that would be erected in all of the Holy See's local provinces, where the appointed governing official for the local territory could recommend "candidates for the priesthood". In 1889, to serve the southern Louisiana area, the Holy See founded the Saint Joseph Seminary College in St. Benedict, Louisiana for the education of men to become priests of the Roman Catholic Church with the day-to-day operations delegated to the Benedictine Monks of Saint Joseph Abbey and the dioceses of the Province of New Orleans and the duly appointed archbishop and bishops within the Province of New Orleans. In 1911, Holy See founded St. John Seminary in The Province of New Orleans in Little Rock, Arkansas and Holy See delegated the day-to-day operations of the seminary to the Diocese of Little Rock and its duly appointed bishops, with oversight and

control to the duly appointed archbishops of The Province of New Orleans; in 1922 Holy See designated St. John's Seminary to be the "home missions" seminary for the entire United States. With the passage of time, seminaries continue to be the object of the Holy See's concern where jurisdiction over the seminaries has been reserved and assigned to the institutional departments of the Holy See in order to provide a universal character for the establishment, governance, discipline, nomination of rectors, administration of property, and the studies of the seminaries.

25.     The Second Vatican Council (1962-1965) re-affirmed the critical importance of "priestly training" as a private activity of the Holy See and solemnly embraced the notion that "the destiny of the Church is closely bound" to its seminaries.  The "Decree on the Training of Priests" from the Second Council makes it clear that the Holy See is "fully aware that the desired renewal of the whole Church depends upon a priestly ministry."  Through it's norms and directives for seminaries, the Holy See maintains direct involvement with the "formation of clerics" and the details of the complete training to be imparted to future ministers of the Roman Catholic Church.  Defendant Holy See oversees and controls the admissions requirements and curricula to ensure that "candidates to the priesthood" are properly prepared to minister and serve the Catholic faithful.

26.     The Vatican sets all of the certification rules for becoming a priest.  These rules dictate who can administer the process, who can be made a priest, who is barred from the priesthood, how the ceremony is to be conducted when someone becomes a priest, and how to document the process. Defendant Holy See directly and definitely controls the standards, morals, and obligations of the clergy of the Roman Catholic Church by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious both delegated by the Pope and acting on his behalf and under his authority.  Holy See mandates the morals and standards of conduct

9

of all clergy of the Roman Catholic Church by enforcement of the Code of Canon Law written and promulgated by Defendant Holy See and used as the employee manual for clergy.

27.     Once certified as a Roman Catholic clergyman, all clergy and priests agree and vow to show respect and obedience to Defendant Holy See, the Pope and their bishop and/or archbishop. A priest receives financial support throughout the full length of his life, and he may not be deprived of his pension or his clerical status unless the Holy See approves.

28.     The Holy See has complete and final control over each bishop, archbishop, cardinal, priest and cleric within the Catholic Church.  Holy See has the final and sole power to remove individual clergy and no priest, bishop, archbishop, cardinal or cleric may be removed from service or position of leadership without the approval of Defendant Holy See; nor can any priest, bishop, archbishop, cardinal or cleric remain in service or a position of leadership over the objection of Defendant Holy See.  Defendant Holy See is also directly and solely responsible for removing bishops, archbishops and cardinals from service and/or making them ineligible for positions of leadership in the various local divisions and offices of the Roman Catholic Church by issuing instructions, mandates and dictates in the United States.

29.     Defendant Holy See creates, appoints, assigns, reassigns and retires all clerics in the order of bishop.  Holy See exercises the power to directly assign and remove individual priests and deacons through the archbishops and bishops that the Holy See appoints to govern and control the archdioceses and dioceses, respectfully.  Defendant Holy See also examines and is responsible for the work and discipline and all things which concern archbishops, bishops, priests and clerics.  In furtherance of this duty, Defendant Holy See requires archbishops and bishops to file a report, on a regular basis, outlining the status of and any problems with clergy.

30.     In 1962, the Holy See issued "Instruction on the Manner of Proceeding in Cases of Solicitation" ("1962 Instructions") to all archbishops, bishops, and other diocesan ordinaries, which contains mandatory and specific instructions on the handling of child sex abuse by clergy "ordering upon those to whom it pertains to keep and observe it in the minutest detail".  Moreover, at all times material herein, the Defendant Holy See mandated the highest level of secrecy for all those involved in handling allegations of sexual abuse, to include its agents duly appointed as archbishops to govern and control the Province of New Orleans and the New Orleans Archdiocese, Joseph Rummel (duly appointed from 1934- 1964), John P. Cody (duly appointed from 1964- 1965), Philip Matthew Hannan (duly appointed from 1965- 1989), Francis Bible Schulte (duly appointed from 1989- 2001), Alfred Clifton Hughes (duly appointed from 2002- 2009) and Gregory Michael Aymond (duly appointed from 2009- present) and its agents duly appointed as bishops of the Diocese of Lafayette, Maurice Schexnayder (duly appointed from 1956- 1972), Gerard L. Frey (duly appointed from 1972- 1989), Harry J. Flynn (duly appointed from 1989- 1994), Edward J. O'Donnell (duly appointed from 1994- 2002), Michael Jarrell (duly appointed from 2002- 2016) and J. Douglas Deshotel (duly appointed from 2016- present).  The policies of the Holy See expressed in the 1962 Instructions and in other documents require bishops and archbishops in the United States to, among other things, refuse to report childhood sexual abuse committed by Catholic priests to criminal or civil authorities, even where such failure to report would itself be a criminal offense.

31.     In the mid-1950's, the Archdiocese by and through its duly appointed Archbishop Rummel recruited and admitted Kenneth Romain Morvant to Saint Joseph's Seminary College and St. John's Home Missions Seminary where the Archdiocese and Archbishop Rummel supervised and controlled Morvant's education and training as a seminarian and "candidate to the priesthood," all

according to Defendant Holy See's norms and requirements for "priestly training" of Roman Catholic Priests.

32.     In 1961, Defendant Holy See, by and through the Archdiocese and its duly appointed Archbishop Rummel, approved Morvant's "priestly training" from St. John's Home Missions Seminary. In May 1961, the Holy See authorized the Archdiocese and Archbishop Rummel to certify Morvant for the ministry as a Roman Catholic Priest. At Morvant's ordination conducted by Bishop Schexnayder, Morvant agreed to be obedient to his Archbishop and the Holy See (the Pope).

33.     Qualified and cloaked with the Holy See's certification for the Roman Catholic ministry and ordination by and through the Archdiocese and its duly appointed Archbishop Rummel, the Diocese of Lafayette accepted, employed and assigned Father Morvant as a Roman Catholic Priest, pastor, minister and counsel entrusted with the care of souls. From 1961 to 1966 Father Morvant was employed as a Diocesan Priest and Pastor at Cathedral of St. John the Evangelist, Lafayette, Louisiana, a parish in The Diocese of Lafayette. From 1966 to 1970, Father Morvant was employed as a Diocesan Priest and Pastor at St. Anthony of Padua, Eunice, Louisiana, also a parish in The Diocese of Lafayette. In 1970, The Diocese of Lafayette transferred Father Morvant to St. Martin's (later St. Martin of Tours) in St. Martinville, Louisiana where Morvant remained until 1980 when he was suddenly removed from the parish in the wake of rumors and innuendos; the devout Catholic congregation that were Morvant's loyal supporters received no official explanation or announcement from the Holy See's agents and officials in the Province of New Orleans about Morvant's sudden disappearance from the dense Catholic community. In 1981 and 1882, Defendants Holy See and the Archdiocese reported Father Morvant "on special assignment" with the Diocesan Tribunal in Lafayette, Louisiana. In 1982 to 1986, Father Morvant returns to St. Martinville,

Louisiana as Rev. Monsignor Morvant; The Diocese assigns Morvant to the Coteau Holmes Parish, serving as the sacramental minister for the Independent Mission, St. Elizabeth's Chapel. From 1987 to 1989, the Archdiocese again reports Rev. Monsignor Morvant "on special assignment" with "Vice Officialis" and in residence at St. Bernard Church in Breaux Bridge, Louisiana. In 1990 and 1991, the Archdiocese reports Rev. Monsignor Morvant in graduate studies in Washington, D.C. Defendants Holy See and the Archdiocese do not report Morvant's location in 1992 or 1993. Morvant, however, reappears in 1994, again "on special assignment" with the "Office of the Tribunal" in Lafayette, Louisiana where Rev. Monsignor Morvant remains until his death in 2003.

34.     Plaintiffs alleges that between 1972 and 1982, Morvant engaged in inappropriate sexual activities with male children as a Diocesan Priest with The Diocese of Lafayette and raped and molested and sexually abused and exploited Catholic boys at St. Martin of Tours Church and Trinity Catholic Elementary School, as well as in other parishes within The Diocese of Lafayette, just as other Catholic boys had been raped and molested and sexually abused and exploited by Morvant between the mid-1950's and 1961 while the Archdiocese and its duly appointed archbishop supervised and controlled Morvant's education and training as a seminarian and "candidate to the priesthood" for the Roman Catholic Church at Saint Joseph Seminary College and St. John's Home Missions Seminary. During the time-frame of the sexual abuse alleged herein, Morvant's employment and assignment with the Diocese was an official Catholic Priest in charge of educating and training young parishioners (children) in the Catholic doctrines and traditions and the required rites of passage for becoming a legitimate member of the Roman Catholic Church. Morvant was therefore a duly recognized vice-principal, employee, agent, apparent agent, and/or an ostensible agent of the Diocese and the Archdiocese when he sexually molested, exploited and raped John Doe I, John Doe II, John

Doe III, John Doe IV and John Doe V and other children in the Province of New Orleans and including the Diocese of Lafayette.

35.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V were all raised in families of devout Roman Catholics.  Plaintiffs' attended grade school at Trinity Catholic Elementary School in St. Martinville, Louisiana, which was operated by and located on the grounds of St. Martin of Tours Catholic Church (formerly St. Martin's Church) in St. Martinville, Louisiana where Plaintiffs' families were longstanding faithful members.  Plaintiffs' families devoted thousands of volunteer hours and contributed regular tithings to the Catholic Church, which contributions funded numerous Catholic activities including charitable activities of The Diocese of Lafayette and their Catholic Charities.  Plaintiffs were baptized and confirmed in the Roman Catholic faith and had been taught to believe and to rely upon the moral and spiritual guidance of Catholic priests and archbishops and bishops and developed great trust, confidence, reverence, respect and obedience to the Roman Catholic Church and its Holy Fathers.  Plaintiffs attended Catholic church services regularly at St. Martin's Church and Trinity Catholic Elementary School, served as altar boys and regularly received Holy Communion, administered by Father Morvant.  Plaintiffs continue to be Roman Catholic.

36.     As loyal Catholics, Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V trusted that the Roman Catholic Church, its servants and official representatives, its priests, archbishops and bishops would always act as they held themselves out to be, namely: holy and chaste men, acting in Plaintiffs' best interests, with confidence that they would never expose Plaintiffs to any known danger, especially sexual predation.  Plaintiffs trusted and expected all Defendants to act on their behalf with the highest degree of trust, confidence, honesty, good faith and

14

loyalty.

37.     Plaintiffs' parents required their participation in activities that followed the Roman Catholic structure and encouraged them to be altar boys, hoping that a positive male influence would develop through associating with Father Morvant as a role model, holy priest and spiritual advisor entrusted with the care of souls as a pastor at St. Martin of Tours Church and Trinity Catholic School. Father Morvant and later Rev. Monsignor Morvant, using his position as a priest, pastor and Tribunal Official with The Diocese, ingratiated himself with Plaintiffs and became a trusted holy priest, spiritual advisor, family friend, and an honored guest in Plaintiffs' home.  During the course of establishing a pretense of extending himself as a positive adult male role model, priest and spiritual advisor, and as Father Morvant would prepare to perform and/or following the holy sacraments and other rituals and duties of a Roman Catholic Priest, Father Morvant drugged Plaintiff John Doe I with alcohol, then raped and sexually molested, abused and exploited John Doe I repeatedly on a weekly basis through various deviant methods, including *inter alia* fondling and masturbating Plaintiff's genitals with Morvant's hands and mouth and raping Plaintiff during the "sleepovers" Morvant hosted with numerous adolescent boys on Friday and Saturday nights in his living quarters at St. Martin's Church during Plaintiff's adolescent years from 1975 to 1978; Father Morvant drugged Plaintiff John Doe II with alcohol, then sexually molested, abused and exploited John Doe II repeatedly on a weekly basis through various deviant methods, including *inter alia* fondling and masturbating Plaintiff's genitals with Morvant's hands and mouth during the "sleepovers" Morvant hosted with numerous adolescent boys on Friday and Saturday nights in his living quarters at St. Martin's Church during Plaintiff's adolescent years from 1972 to 1977; Father Morvant drugged Plaintiff John Doe III with alcohol, then sexually molested, abused and exploited John Doe III in three(3) separate instances

15

through various deviant methods, including *inter alia* fondling and masturbating Plaintiff's genitals with Morvant's hands and mouth and demanding John Doe III to fondle and masturbate Morvant during the "sleepovers" Morvant hosted with numerous adolescent boys on Friday and Saturday nights in his living quarters at St. Martin's Church when Plaintiff was an adolescent in the fall of 1975; Father Morvant drugged Plaintiff John Doe IV with alcohol, then sexually molested, abused and exploited John Doe IV in two(2) separate instances through deviant methods, including *inter alia* fondling and masturbating Plaintiff's genitals during the "sleepovers" Morvant hosted with numerous adolescent boys on Friday and Saturday nights in his living quarters at St. Martin's Church when Plaintiff was an adolescent in the spring and summer of 1978; Rev. Monsignor Morvant drugged Plaintiff John Doe V with alcohol, then sexually molested, abused and exploited John Doe V in one(1) instance through various deviant methods, including *inter alia* fondling and masturbating Plaintiff's genitals during the "sleepover" Morvant hosted with numerous adolescent boys on Friday and Saturday nights at his palatial diocesan residence across from the St. Martinville City Park when Plaintiff was an adolescent in the fall of 1982.  Plaintiffs were so severely traumatized by Morvant's deviant sexual advances and behavior and by then Bishop Frey's unwavering absolute support for Morvant and adament refusal to report Morvant's deviant sex acts with children in the Diocese to the authorities to conduct an official independent investigation that Plaintiffs lost all recollection and memory of the specific incidents and acts of sexual abuse and exploitation until late 2016.  In late 2016, Plaintiffs' were contacted by a mutual childhood friend who Morvant had also sexually molested, abused and exploited as an adolescent.  The mutual friend informed Plaintiffs that Morvant had not only sexually abused Plaintiffs but that Morvant had sexually abused over 50 other children as a Catholic priest with Defendants Archdiocese and Diocese.  It was only after hearing about Morvants crimes against other children that Plaintiffs recalled Morvant's sexual advances and the

details of their sexual contact with Morvant.

38.     Plaintiffs would show the Court that the proximate cause of Morvant's access to Plaintiffs was Morvant's education, training and certification for the Roman Catholic ministry at the Holy See's Saint Joseph's Seminary College and St. John's Home Missions Seminary, both operated and controlled by the Archdiocese and its duly appointed archbishop according to the Holy See's rules and norms for priestly training.   As a Catholic Priest ordained by the Holy See through the Archdiocese and its duly appointed Archbishop Rummel, Morvant was then authorized to work and carry out the mission of the Roman Catholic Church in the Diocese of Lafayette.   In Morvant's position and assignment as a Roman Catholic diocesan priest and pastor with the Diocese of Lafayette, Morvant was a vice-principal, employee, agent and servant of the Diocese of Lafayette, the Holy See and the Archdiocese.   Based on Morvant's status as an agent of the Diocese, the Holy See and the Archdiocese, Morvant's own knowledge of his own vile sexual propensities to rape, molest, abuse and exploit boys is imputed to the Diocese, the Holy See and the Archdiocese.   Plaintiffs and their families dealt with these Defendants in good faith and believed Morvant was acting in the scope of his employment.

39.     Plaintiffs' sexual abuse and exploitation arose from the exercise of authority, power and access created by Morvant's job assignments and official duties as a Catholic priest and pastor serving in The Diocese of Lafayette and the Province of New Orleans.   The Archdiocese and its duly appointed archbishop and the Diocese and its duly appointed bishop knew or should have known of Morvant's dangerous sexual propensities, yet the Archdiocese and its duly appointed archbishop did nothing to terminate Morvant's authority and power as a Roman Catholic Priest and the Diocese and its duly appointed bishop did nothing to remove Morvant from his position and job assignments with access to minor boys or to control Morvant's access to the minor boys he sexually abused as the result

17

of his official duties and job assignments as a diocesan priest.  Morvant raped and molested and sexually abused and exploited Plaintiffs as a result of Morvant's official duties and job assignments as a Catholic seminarian and cleric, priest and pastor.

40.     As a direct result of the sexual abuse by Morvant and the events pled herein which were carried out by the Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops both prior to and following the abuse, Plaintiffs have suffered continuous psychological injuries from the time of the abuse and through the present time.  Plaintiffs' continuous psychological injuries are chronic and so severe as to constitute a disability that has caused Plaintiffs to be unable to sue or act to assert the claims plead herein against Defendants Holy See, the Archdiocese, Archbishop Aymond, the Diocese and Bishop Deshotel.

41.     The delay in treatment proximately caused additional emotional and psychological injuries to Plaintiffs and their emotional and psychological injuries have become chronic due to the fact that Plaintiffs did not receive prompt and proper ongoing treatment and therapy for this sexual abuse.  The effect of Plaintiffs' continuous, chronic psychological disability has caused Plaintiffs to digress, emotionally and behaviorally, suffer emotional trauma, anguish, loss of respect for authority, loss of earnings and earning capacity, and commence upon a self-destructive course of conduct, all of which was a foreseeable result of Morvant's sexual abuse and the actions of Defendants Holy See, the Archdiocese, Archbishop Aymond, the Diocese and Bishop Deshotel.

42.     The Archdiocese and its duly appointed archbishop and the Diocese and its duly appointed bishop wholly failed to conduct an adequate investigation to determine whether Morvant was suitable and fit for a position of trust and confidence involving access to and power over children.  Had such an investigation been conducted, Defendants Holy See, the Archdiocese and its duly appointed archbishop and the Diocese and its duly appointed bishop would have learned that Morvant

was a sexual predator to minor boys. From the beginning of Morvant's ordination into the priesthood by the Holy See and the Archdiocese and Morvant's job assignments as a priest and pastor serving in The Diocese of Lafayette and through 1982 when Morvant was "on special assignment" as a priest with The Diocese of Lafayette, Morvant sexually abused minor boys on premises owned and/or operated by the Archdiocese and the Diocese, with the Archdiocese and Archbishops Rummel, Cody and Hannan and the Diocese and Bishops Schexnayder and Frey's knowledge that minor boys were constantly present and were frequent overnight visitors in Morvant's personal quarters on the Catholic Church's premises.

43.    During the many occasions when Defendant Holy See and its agents, the Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops, knew or should have known of the dangerous sexual propensities of Morvant, Defendant Holy See and the Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops never reported the matter to the authorities, as required by Louisiana's mandatory reporting laws and under customary international laws of human rights. Instead Holy See and the Archdiocese and Archbishop Joseph Rummel qualified and certified, ordained and authorized Morvant to work and serve as a Catholic priest with the Diocese, where Morvant was then reassigned from parish to parish as a Diocesan Priest and pastor by Bishops Maurice Schexnayder and Gerard Frey.

44.    By 1984, the Archdiocese and Archbishop Philip Hannan were dealing with reports that a number of other priests in the Province of New Orleans were sexually abusing minors. Prior to 1981, the Archdiocese and Archbishop Philip Hannan were aware of complaints about Morvant's activities with minor boys. Between 1972 and 1980, the Diocese and Bishop Gerard Frey were aware of complaints about Morvant's activities with minor boys when Bishop Frey placed Morvant at the Diocesan Tribunal "on special assignment," elevated Morvant's rank/status to "Rev. Monsignor" and

allowed Morvant to continue in his position as a Catholic priest, which position provided Morvant with access to boys until Morvant's death in 2003.  In accord with the Holy See's 1962 Instructions, the Archdiocese and duly appointed Archbishop Hannan and the Diocese and Bishop Frey held a secret church proceeding in late 1980 where Morvant testified under oath about the details of the numerous incidents where he sexually abused and exploited Plaintiffs and other boys while Morvant served as a priest in the Province of New Orleans.  In accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel concealed Morvant's testimonial confession from Plaintiffs and the public and the authorities, while continuing to represent Morvant as a priest, "Rev. Monsignor," with high moral character, when in fact Morvant had confessed to outrageous, egregious crimes against children.  Moreover, in accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel covered up the information about Morvant's sex crimes against Plaintiffs and other boys in the Province of New Orleans and failed to disclose the information to Plaintiffs and the public or the authorities.  Furthermore, in accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel concealed their knowledge about the injuries Plaintiffs and the other boys were suffering and failed to disclose this knowledge to Plaintiffs or the public or the authorities.  Finally, in accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel concealed the transcripts from the 1980 church proceeding.  The transcripts from the 1980 church proceeding would have revealed

Morvant's testimonial confession and the information about his sex crimes against Plaintiffs and other boys in the Province of New Orleans and the Holy See and its agents' knowledge about Morvant's heinous conduct and the resulting injuries suffered by Plaintiffs and the other boys.  Instead, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel never acted on their knowledge or the transcripts all together.  The conduct of the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel, including failing to act on their knowledge of Morvant's crimes and Plaintiffs' injuries and the transcripts, was a substantial factor in causing Plaintiffs' damages as plead herein.  Public knowledge of Morvant's crimes would have revealed negligence and deceptive statements of the Holy See and its agents in the Province of New Orleans, and the existence of Plaintiffs' claims against the Defendants.  At that time, Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V were not yet eighteen (18) years old.  Instead, this information was concealed and covered up by the Holy See and its agents, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and by the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel.

45.     All Defendants held themselves out as counselors and instructors on matters that were spiritual, moral and ethical.  By maintaining and encouraging such a relationship with Plaintiffs, all Defendants entered into a confidential or fiduciary relationship with Plaintiffs grounded upon the duty of good faith, fair dealing and the duty to act with the highest degree of trust and confidence.  As a result of Plaintiffs' confidence and trust in Defendants, the Defendants gained superiority and influence over Plaintiffs.  The fiduciary relationship of confidence and trust imposes on the Defendants the duty and obligation to render full and fair disclosure to Plaintiffs of all facts that

materially affect Plaintiffs' rights and interests.  This fiduciary relationship includes the duty to disclose and to act to protect and or aid Plaintiffs from rape and molestation and sexual abuse and exploitation by Catholic clerics and priests, whom Defendants promote as being sexually safe, i.e. celibate and chaste.

46.     Plaintiffs were unable to discover that Defendants breached any duty owed to Plaintiffs giving rise to these claims against Defendants.  Plaintiffs were effectually prevented from availing themselves of their causes of action against Defendants due to the Defendants' acts of fraud, misrepresentation, concealment, breach of fiduciary duty, and concert of action to conceal these criminal and negligent activities, giving rise to a "civil conspiracy."  Defendants had a unique knowledge of the facts giving rise to Plaintiffs' claims against them but fraudulently concealed and failed to disclose these facts to Plaintiffs.  Plaintiffs thus pleads ignorance of the facts of Defendants' fraud, misrepresentation, concealment, breach of fiduciary duty and continuing overt acts in furtherance of a civil conspiracy, and Plaintiffs' causes of action against these Defendants.  Plaintiffs' ignorance of such facts was not willful, negligent or unreasonable.

47.     Defendant Holy See and the Archdiocese and its duly appointed archbishops, including Defendant Aymond, failed to properly report the illegal sexual abuse of children by Morvant as required by law prior to 1980 and in 1981 and 1982 and thereafter.  Defendant Holy See and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel failed to properly report the illegal sexual abuse of children by Morvant as required by law prior to 1980 and in 1981, 1982, 1992, 1993, 1994 and thereafter.  Specifically, Defendants had a duty under Louisiana's mandatory reporting laws and customary international laws of human rights, but failed to report scores of cases of  "AGGRAVATED RAPE" under La. R.S. §14:42 (now referred to as "First Degree Rape"), "THIRD DEGREE RAPE" under La. R.S. §14:43, "AGGRAVATED ORAL SEXUAL BATTERY"

under La. R.S. §14:43.4 (since repealed), "INDECENT BEHAVIOR WITH JUVENILES" under La. R.S. §14.81, "MOLESTATION OF A JUVENILE" under La. R.S. §14:81.2, "SEXUAL BATTERY" under La. R.S. §14:43.1, "MISDEMEANOR SEXUAL BATTERY" under La. R.S. §14:43.1.1, "SECOND DEGREE SEXUAL BATTERY" under La. R.S. §14:43.2 and "ORAL SEXUAL BATTERY" under La. R.S. §14:43.3.   Defendant Holy See and the Archdiocese and its duly appointed archbishops, including Defendant Aymond and the Diocese and Bishops Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel further failed to report the illegal sexual abuse of children by other priests as required by law in the 1980's and through the present time.

## IV.  CIVIL CONSPIRACY

48.     The problem of childhood sexual abuse committed by Roman Catholic clergymen was first acknowledged by the Holy See in 306 A.D. at the Council of Elvira in Spain when the council passed formal legislation condemning sexual abuse by the clergy, including sexual abuse of boys. This early law continues in the current 1983 version of the Code of Canon Law which expressly forbids priests and clerics from having sexual relations or relationships with children.  The Code of Canon Law is mandatory and must be obeyed by all dioceses, archdioceses, religious orders, appointed bishops and archbishops, superior generals and priests and clerics.  Both old and current laws demonstrate that Defendant Holy See and all of its members, agents and employees, including The Archdiocese of New Orleans and its duly appointed archbishops, to include current Archbishop Aymond, and The Diocese of Lafayette and its duly appointed bishops, to include current Bishop Deshotel, are well aware of the practices of childhood sexual abuse by Roman Catholic priests and clerics while serving and during the course of the Holy See's ministry.

49.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V allege that Defendant Holy See has established exclusive policies and standards that dictate how sexual

abuse of children by clergymen of the Holy See will be handled.  In 1922, the Holy See released a confidential document regarding cases of solicitation of sex, which mandated a specific procedure for the Holy See's agents to use when a cleric or priest solicited sex from a child while in and during the course of the Holy See's ministry and the document required strict secrecy.  Under the Holy See's 1962 Instructions- an official legislative text issued by the Congregation of the Holy Office and specifically approved by Pope John XXIII-  penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent." Defendant Holy See created and maintained this policy of complete secrecy and transfers, even if that secrecy violated state, federal or international law, threatening all involved with excommunication and thus, damnation, if they do not comply.  According to the 1962 Instructions, once these non-discretionary penalties are levied, only the Holy See has the power to alter or remit the punishment.

50.     In 1963, a report from a Catholic religious order in the U.S.A. to Pope Paul VI (1963-1978) communicated that "problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counseling."  This same report, which concluded that pedophiles were unrepentant, manipulative and dangerous and should be removed from the priesthood because they could not be cured, had been delivered to bishops and archbishops in the U.S. for the previous 10 years.  At this point in modern times, the Holy See and its agents and duly appointed employees knew it had a widespread problem of Catholic clergy molesting minors.

51.     In response to repeated warnings that Catholic pedophile clerics and priests were dangerous and should be removed from the ministry, the Holy See authorized and created facilities in the U.S.A. where "priests ... who have been addicted to abnormal practices, especially sins with the young...." would be sent for short periods rather than "given the alternative of a retired life within the protection of monastery walls or complete laicization."  Beginning in the 1960's, a large network

24

of private Catholic owned and operated psychiatric treatment centers and hospitals was established across the United States solely for the treatment of Catholic Clerics and Priests upon referral by their bishops and archbishops and superior generals. These treatment centers have treated Clerics and Priests exhibiting psychosexual disorders of pedophilia and ephebophilia. The treatment center operated by the Servants of the Paraclete, a Catholic religious order in New Mexico, was established in 1977 and was the first of such treatment centers in the world, secular or religious, to have an established residential healthcare program for the treatment of pedophilia and ephebophilia. This center evaluated and treated over 1,000 cleric and priest perpetrators, who the Catholic order referred to as "guests", from 1976-1995, including Rev. Monsignor Kenneth Romain Morvant.

52.      Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V allege that at least by the mid 1960's, the Catholic superior generals, bishops and archbishops of the United States, to include Archbishop Philip Hannan of the New Orleans Archdiocese, were well aware of the illegal sexual abuse of children by Catholic Clerics and Priests and of the state statutes requiring the reporting of sex crimes against children. These superior generals and bishops and archbishops and Archbishop Philip Hannan were also aware that Catholic Clerics and Priests gained access to these children as the direct result of their status and responsibilities as Clerics and Priests who, as spiritual advisors and role models, exercised tremendous power over these children and their families. Archbishop Philip Hannan and Bishop Maurice Schexnayder of The Diocese of Lafayette were well aware of Morvant's sex crimes against children.

53.      By 1999, the government of Ireland began investigating the sexual abuse of minors by clergy. Ireland's published conclusions include: the Catholic Church had a systemic problem of numerous clergy sexually abusing children; cases of sexual abuse were managed within the institution of the Church with a view to minimizing the risk of public disclosure and consequent

damage to the institution; the offenses were not reported to the police because of a culture of silence about the issue; the recidivist nature of sexual abuse was well known to authorities within the institution; the Church authorities knew that the sexually abusing clergy were often long-term offenders who repeatedly abused children; when confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location https://assets.documentcloud.org/documents/243712/4-murphy-report-entire-ireland.pdf (last viewed December 23, 2019).

54.     In Catholic Dioceses and Archdioceses throughout the United States, to include The New Orleans Archdiocese and The Diocese of Lafayette, when cases of illegal rape and molestation and sexual abuse and exploitation of minors by Catholic Clerics and Priests have surfaced, these cases have been handled in such a uniform fashion as to demonstrate a common plan and scheme for concealing these crimes from the public, failing to report the crimes and thus avoiding criminal prosecution of cleric and priest perpetrators and the filing of civil claims by victims by covering the claims up. This common plan and scheme was in existence before Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V were sexually abused and exploited and was followed to conceal the crimes against children by Morvant and other Clerics and Priests in the Holy See's ministry, including the Clerics and Priests in the Province of New Orleans and specifically, The New Orleans Archdiocese and The Diocese of Lafayette, Saint Joseph Seminary College and St. John's Home Missions Seminary. The members of this common plan and scheme included Holy See and its official representatives and agents and the official representatives and agents of The New Orleans Archdiocese, its duly appointed archbishops, including Defendant Archbishop Aymond and the official representatives and agents of The Diocese of Lafayette, to include Bishops Schexnayder, Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel and Morvant, and others unknown to

Plaintiffs.

55.     The Defendants herein were aware of the harm to Plaintiffs and the wrongful conduct of Morvant at the beginning of the combination or agreement.   These Defendants intended to accomplish the unlawful purpose of concealing sex abuse against children by Morvant and other Clerics and Priests and/or intended to conceal their breach of duty by the unlawful means of failing to report Morvant and other known perpetrators as required by Louisiana's mandatory reporting laws and the customary international laws of human rights.  These Defendants knowingly caused further injury to Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V and other children as a result of failing to report sexual abuse and exploitation.  This combination had the result of concealing sexual abuse of children by fraudulent and illegal means and concealing the facts giving rise to Plaintiffs' claims for civil damages against all Defendants.  Acts in furtherance of this civil conspiracy were committed prior to and after late 2016.

56.     The elements of a "civil conspiracy" have therefore been met by the actions of the Holy See, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond and the Diocese and Bishops Schexnayder, Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel and Morvant as follows: (1) the combination consists of two or more persons; (2) the combination desires to either accomplish an unlawful purpose (concealing the rape and molestation and sexual abuse and exploitation of children by failing to report said abuse) and/or to accomplish a lawful purpose by unlawful means (concealing their breach of duty by failing to report said rape and molestation and sexual abuse and exploitation); (3) there is a meeting of the minds on the object or course of action; (4) there are numerous unlawful, overt acts, i.e., i) the numerous separate instances of illegal sexual misconduct and ii) the failure to report the numerous separate instances of suspected child abuse and exploitation as required by Louisiana's mandatory reporting statutes

27

and customary international laws of human rights; and (5) damages to the victims as the proximate result.

57.     All Defendants participated in coordinating the action, including the Holy See, the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond and the Diocese and Bishops Schexnayder, Frey, Flynn, O'Donnell, Jarrell and Defendant Deshotel, which resulted in the use of fraud and misrepresentation. This series of events was carried out as part of the civil conspiracy pled herein to keep the rape, molestation, sexual abuse and exploitation of children a secret, and avoid the prosecution of cleric and priest perpetrators.  False representations were used to prevent the public from knowing of this high-profile case.  Efforts to conceal this combination are on-going and have included the unlawful failure to report Morvant to the proper authorities prior to 1980 and in 1980 and 1981 and 1982 and 1992 and thereafter.

## V.  CLAIMS OF FRAUD AND CONCEALMENT

58.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V allege fraud against Holy See and its agents, the Archdiocese and the Diocese, and the Holy See employees duly appointed as archbishop of the Archdiocese and as bishop of the Diocese, including Defendant Archbishop Aymond, Defendant Bishop Deshotel and Morvant, in that (1) each Defendant made material representations; (2) their representations were false; (3) each Defendant knew their statements were false when the Defendant made the statements or recklessly made the statements as a positive assertion without knowledge of the truth; (4) each Defendant intended that Plaintiffs rely on the Defendant's misrepresentations; (5) Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V relied on the misrepresentations; and (6) Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V suffered injury.

59.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V claim

that the Defendant Holy See and its agents, the Archdiocese and the Diocese, and the Holy See employees duly appointed as archbishop of the Archdiocese and as bishop of the Diocese, including Defendant Archbishop Aymond, Defendant Bishop Deshotel, and Morvant, took actions designed to conceal the cause of Plaintiffs' injuries and each of these Defendants' breach of duty which gives rise to Plaintiffs' claims against these Defendants.  Plaintiffs allege that (1) each Defendant had actual knowledge of the facts concealed and (2) each Defendant had a fixed purpose to conceal the wrong.  Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V thus allege facts sufficient to establish concealment in that Plaintiffs have established (1) the existence of the underlying tort; (2) each Defendant's knowledge of the tort; (3) each Defendant's use of deception to conceal the tort; and (4) Plaintiffs' reasonable reliance on Defendants' deception.

## VI.  CAUSE OF ACTION AGAINST THE ARCHDIOCESE AND THE DIOCESE

60.    The Archdiocese and the Diocese negligently assigned or employed Morvant for a position of trust, confidence, and authority as a Catholic cleric and priest in direct contact with children when these Defendants knew or should have known of Morvant's dangerous sexual propensities, thus negligently entrusting minors to Morvant's dubious care.

61.    The Archdiocese and the Diocese negligently failed to a) warn Plaintiffs and their families, or any of the Catholic faithful, including the faithful parents and parishioners at St. Martin of Tours Catholic Church and Trinity Catholic Elementary School, of Morvant's dangerous propensities, despite knowledge and notice of these propensities and b) implement reasonable policies and procedures to prevent unsupervised overnight access to children by Morvant even though these Defendants knew or should have known Morvant was a danger to children.

62.    The Archdiocese and the Diocese failed to a) provide reasonable supervision of Morvant's activities with children and b) investigate numerous notices that Morvant was a danger to

29

minor boys and remove him from a position involving contact with minors.

63.     Plaintiffs allege that the Archdiocese and the Diocese are liable for the acts and/or omissions of Morvant under the legal doctrine of negligent assumption of the risk of intentional or criminal conduct, just as the archbishops and the bishops as the duly appointed governing official of the New Orleans Archdiocese and the Diocese, respectively, are responsible for the acts and omissions of any Catholic cleric or priest who is a member of the New Orleans Archdiocese and the Diocese.  The Archdiocese and the Diocese realized or should have realized that Morvant posed an unreasonable risk of harm to minor boys, including Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V.  Plaintiffs thus plead Section 302B of the Restatement (Second) of Torts, Section 302B.

64.     The Archdiocese and the Diocese negligently failed to implement reasonable policies and procedures to prevent unsupervised access to children by Morvant even though these Defendants knew or should have known Morvant was a danger to male children.  Morvant's own knowledge of his sexual propensities to rape and sexually molest and abuse and exploit boys is imputed to the Archdiocese and the Diocese.  Furthermore, Plaintiffs and their families dealt with these Defendants in good faith and believed Morvant was acting in the scope of his employment as a Catholic cleric, priest and pastor and educator training young parishioners in the Catholic doctrines and traditions at St. Martin of Tours Church and Trinity Catholic Elementary School.  Based on Morvant's status as an agent of the Archdiocese and the Diocese, Plaintiffs plead Section 5.04 of the Restatement (Third) of Agency, Section 5.04 and Section 282, comment f of the Restatement (Second) of Agency, Section 282, comment f.

65.     The Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond and the Diocese and its Bishops Schexnayder, Frey, Flynn, O'Donnell, Jarrell and Defendant

Bishop Deshotel illegally failed under state, federal and international law to report Morvant to the civil authorities and to parents as a suspected child abuser on numerous occasions before and after Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V were raped, sexually molested, abused and exploited by Morvant.

66.     The Archdiocese and the Diocese's conduct at the time and on the occasions in question and continuing through the present day, including the concealment of the Holy See's policy of harboring and protecting its abusive priests, agents and employees from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities and endangering scores of vulnerable children while deceiving devout Catholics members in the Province of New Orleans, is so outrageous and extreme in degree and beyond all possible bounds of decency, so as to be regarded as utterly atrocious in a civilized society and has resulted in the intentional infliction of emotional distress upon Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V.

67.     The Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops fraudulently concealed their knowledge of the criminal activities of Morvant and others for the purpose of preventing Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V from learning of the existence of their claims against these Defendants for the Archdiocese and Archbishops Rummel, Cody and Hannan and the Diocese and Bishops Schexnayder and Frey's assignment, supervision, investigation, and failure to remove Morvant and to revoke Morvant's certification as a Catholic Priest and to report him to the authorities and to the victims' parents.   The Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and its duly appointed bishops, including Defendant Bishop Deshotel, used deception to conceal Morvant's crimes and to conceal the Archdiocese and Archbishops Rummel,

31

Cody and Hannan and the Diocese and Bishop Schexnayder and Frey's negligence in qualifying and certifying Morvant for the Catholic ministry and/or failing to properly assign, supervise, investigate, remove, and report Morvant to the authorities.  Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V reasonably relied upon this deception which Plaintiffs failed to discover until after late 2016, despite Plaintiffs' due diligence.

68.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V allege that the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and its duly appointed bishops, including Defendant Bishop Deshotel, breached their fiduciary duty to Plaintiffs by failing to disclose their knowledge of Morvant's criminal activities and fraudulently concealing these activities.  This duty includes the duty of good faith, fair dealing, and a duty to act with the highest degree of trust and confidence and to fully and fairly disclose to Plaintiffs all facts that materially affect Plaintiffs' rights and interests.  Plaintiffs did not and could not in the exercise of reasonable diligence learn of this breach of duty until after late 2016, due to the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and its duly appointed bishops', including Defendant Bishop Deshotel,  false representations and material misstatements of facts.

69.     The rape, molestation, sexual abuse and exploitation in this case arose from Morvant's exercise of authority, power, and access created by Morvant's position and employment as a Roman Catholic cleric and priest educated, trained, certified and ordained by and through the Archdiocese and Archbishop Rummel, with recommendations to work and serve as a Diocesan Priest in The Diocese of Lafayette.  Plaintiffs thus plead vicarious liability under the doctrine of respondeat superior.  The Archdiocese and the Diocese's authority over its Catholic clerics and priests exceeds the customary employer/employee relationship, thus the Archdiocese and the Diocese are vicariously

liable for all actions of their actual or apparent agent and employee, Kenneth Romain Morvant.

70.     During the existence of the fiduciary relationship plead herein, the Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops actively and constructively stated and/or represented numerous falsehoods, including the fact that Morvant was a man of good moral character, suitable and fit to be a Catholic cleric and priest in the Roman Catholic Church, who could be entrusted with the care, counseling, teaching, and instruction of adolescent children and that Morvant's status "on special assignment" at the Diocese's "Office of the Tribunal" was voluntary and that Morvant was "in good standing" as a Catholic priest and clergyman. These representations, among others, outlined in these pleadings, were false and untrue and were known to be false and untrue at the time they were made, or were made with a reckless disregard as to whether they were true or false.  These falsehoods and non-disclosures were material facts made with the intent to deceive and to induce reliance and constitute fraud as alleged hereinabove in paragraph 58.  Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V did not learn of the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and its duly appointed bishops', including Defendant Bishop Deshotel, knowledge of the falsity of said representations, and/or of the failure to disclose the unfitness of Morvant until after late 2016.  Plaintiffs neither knew of nor could Plaintiffs have discovered the fraud that had been committed by the Archdiocese and its duly appointed archbishops, including Defendant Archbishop Aymond, and the Diocese and its duly appointed bishops, including Bishop Deshotel until after late 2016.  Plaintiffs' ignorance of these Defendants' fraud was not willful, negligent or unreasonable.

71.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V incorporate the allegations made in paragraph 70 above and state that the Archdiocese and its duly

appointed archbishops and the Diocese and its duly appointed bishops negligently misrepresented that Morvant was of good moral character, suitable and fit to act as a Roman Catholic cleric and priest who could be entrusted with the care, counseling, teaching and instruction of adolescent children such as Plaintiffs.

72.     Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V also allege that the Archdiocese and Archbishop Hannan and the Diocese and Bishop Frey failed to ascertain and apprise Plaintiffs and their families of Morvant's sexually predatory nature.  Thus, the Archdiocese and the Diocese's representation that Morvant was not sexually dangerous to adolescent boys placed Plaintiffs and other boys in peril.  Plaintiffs plead that the Archdiocese and the Diocese failed to exercise reasonable care in qualifying and certifying Morvant for the Roman Catholic ministry and to perform ecclesiastical and parochial assignments involving children, thus negligently misrepresented and negligently gave false information which proximately caused harm to Plaintiffs who reasonably relied upon the representation that Morvant was suitable for a position involving access to minor boys.  Plaintiffs thus plead Section 311 of the Restatement (Second) of Torts and the legal doctrine of negligent misrepresentation involving the risk of physical harm.

73.     The Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops at the time and on the occasions in question, acted with heedless and reckless disregard for Plaintiffs' safety, which disregard was the result of conscious indifference to Plaintiffs' rights, welfare, and safety in violation of the civil and criminal codes of the State of Louisiana and the customary international laws of human rights.  These Defendants' conduct amounted to gross negligence, fraud, and malice as those concepts are understood under the Louisiana Civil Code and are subject to the fines as outlined under the Louisiana Criminal Code.

74.     The actions of the Archdiocese and the Diocese pled in Paragraphs 60 - 73 herein

proximately caused the incidents in question and the damages sustained by Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V.

## VII.  CAUSE OF ACTION AGAINST DEFENDANT HOLY SEE

75.     Defendant Holy See has specifically carved out the treatment of child sex abuse by clergy from other disciplinary matters to have continuing control over this issue, and governs it every day and perpetually according to non-negotiable and mandatory standards.  Under Defendant Holy See's policy on sexual abuse of children, the Holy See mandates certain procedures and absolute secrecy by all involved under penalty of immediate removal from the organization (excommunication), retains the power at all times to conduct the inquisition of the case itself, and admits no deviations from its mandate.  Through its mandated policies and its agents and employees and instrumentalities, Holy See is an integral part of the day-to-day handling of cases of child sex abuse by clergy.  There is no discretion given to its agents and employees in the handling of such cases.

76.     Defendant Holy See has known that child sex abusers have a very high rate of recidivism and are likely to abuse more children.  As such, Holy See knew that children, parents and guardians who did not possess Holy See's knowledge about its clergymen and former clergymen and who unsuspectingly were around those clergymen and former clergymen were at a high risk to be sexually exploited and abused.  Moreover, because of the high rate of recidivism, Defendant Holy See's clergymen and former clergymen had probably already sexually exploited and abused numerous children. Defendant Holy See knew there were many victims out there who were hurt because of Defendant Holy See's policies of secrecy, concealment and self-protection.  Children are at risk because the public and law enforcement do not know the identity and the locations of these clergymen and former clergymen of Defendant Holy See who have been accused of sexual misconduct.

35

77.     Upon information and belief, Defendant Holy See did not report all allegations of child sex abuse by its clergymen and former clergymen to law enforcement, or to those directly in the path of danger, or the public.  Further Defendant Holy See adopted a policy and practice where its agents and employees were not to report abuse by Holy See's clergymen to law enforcement, or to those directly in the path of danger, or the public.  Plaintiffs were harmed as a result of Defendant Holy See's practice and policy of not reporting suspected child abuse to law enforcement officials and requiring secrecy of all its agents and employees who received reports of abuse.

78.     At all times material hereto, Defendant Holy See directed its archbishops and bishops in the United States to conceal from its parishioners and the general public the sexual abuse of children committed by its priests and clerics and candidates to the priesthood.  To shield itself from "scandal" in the United States in 2002, Defendant Holy See denied approval of key provisions adopted by the U.S. Conference of Catholic Bishops that would have required Holy See's agents and archbishops and bishops in the United States to report all known or suspected child abuse to the civil authorities.  Defendant Holy See also refused to give U.S. archbishops and bishops the power to remove abusive priests and clerics from the ministry.  While the "public" policy of Defendant Holy See is to forbid childhood sexual abuse by priests and clerics within its control, the actual "private" or secret policy is to harbor and protect its abusive priests and clerics and candidates to the priesthood from public disclosure and prosecution.  Whether explicit or implicit, the transmission and receipt of these "public" and "private" or secret policies, directives and orders on childhood sexual abuse by the clergy are the actions of Defendant Holy See and its agents and employees that occurred in the U.S.A.  Plaintiffs were sexually abused and exploited as children by Morvant, one of Defendant Holy See's clerics and clergymen.  Defendant Holy See's directives to conceal the sexual abuse of children committed by its clerics and clergymen to maximize revenue and image by avoiding scandal was a

36

substantial factor in bringing about Plaintiffs' abuse.  Plaintiffs thus plead vicarious liability under

the doctrine of respondeat superior.  At all times material herein, the Holy See's authority over its

bishops and archbishops exceeds the customary employer/employee relationship, thus the Holy See

is vicariously liable for all actions of its actual agents and employees, the duly appointed archbishops

of the Archdiocese and the duly appointed bishops of the Diocese.

79.    Defendant Holy See's policy of secrecy under penalty of excommunication for all

involved in an accusation against the clergy or clerics for the crime of solicitation - which includes

sexual abuse of a minor - insulated Morvant from consequences.  Through this policy of secrecy, the

Holy See knowingly allowed and permitted and encouraged child sex abuse by its clerics and priests,

including Kenneth Romain Morvant.

80.    The practices, instructions, mandates and dictates of Defendant Holy See in the United

States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators

among its clerics and priests and candidates to the priesthood under its control and placing children

in a position of harm and peril, whether undertaken under the color of law or only in its capacity as

a private actor, are a gross violation of established, universally recognized norms of international law

of human rights.

81.    The worldwide acceptance of various international agreements, including the

*Convention on the Rights of the Child*, demonstrates that some of their provisions have attained the

status of customary international law.   In 1990 Holy See signed the *Convention on the Rights of the

Child,* which provides "in all actions concerning children ... the best interests of the child shall be a

primary consideration," Art. 3; that the signatories "shall take all appropriate legislative,

administrative, social and educational measures to protect the child from all forms of physical or

mental violence, injury or abuse, ..., including sexual abuse," Art. 19; and that signatories "undertake

to protect the child from all forms of sexual exploitation and sexual abuse," Art. 34. These provisions in the *Convention on the Rights of the Child* and the provisions in the *Universal Declaration of Human Rights* signed by Holy See in 1948 codify longstanding legal human rights norms that reflect actual practices of states in prohibiting childhood sexual abuse and are not so novel as to be considered outside the bounds of what is customary, but are of universal concern. Violations of these customary international law of human rights and crimes which the law of nations attributes individual responsibility have been codified in these various international agreements, include but are not limited to:

a. the *Universal Declaration of Human Rights* in that Defendant Holy See, as a matter of policy, at all times practiced, ignored, tolerated, disregarded, permitted, allowed, condoned or failed to report childhood sexual abuse which the international community and the civilized world views as cruel, inhumane and degrading; and

b. the *Convention on the Rights of the Child*, in that Defendant Holy See, among other things, did not make the interests of minor children in its control its primary responsibility; did not conform to international standards for the safety and health of these children in considering the suitability and fitness of its priests and clerics and "candidates to the priesthood"; did not take all appropriate legislative, administrative, social and educational measures to protect these children from sexual abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of childhood sexual abuse of which it had knowledge; did not take all appropriate measures to ensure that school discipline was administered in a manner consistent with human dignity; and did not undertake to protect these children from sexual exploitation and abuse.

82.     Defendant Holy See, by and through its agents and employees, breached duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states,

the laws of the Louisiana and customary international law of human rights, including but not limited to:    a. The duty to provide safe care, custody and control of the minor children entrusted by their parents to the Roman Catholic churches and schools under the absolute control of Holy See.

b. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that priests and other clerics were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

c. The duty to warn parents and children of a dangerous condition on Holy See's premises.

d. The duty to provide reasonable admission and certification guidelines for candidates for the priesthood to prevent sexual abuse.

e. The duty to not retain or certify seminarians for the priesthood that presented an unreasonable risk of harming others.

f. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

83.    Defendant Holy See knew that its priests and clerics in the United States, and more specifically in the Province of New Orleans and the state of Louisiana, were committing acts of childhood sexual abuse and engaging in dangerous and exploitive conduct as pedophiles, sexual predators and perpetrators of childhood sexual abuse, and that these priests and clerics created an unsafe condition on the premises of the churches and schools occupied and run by the Archdiocese and its duly appointed archbishops and the Diocese and its duly appointed bishops, to whom the custody and control of minor children was placed.

84.    The acts and omissions of Defendant Holy See, including the concealment of its policy of harboring and protecting its abusive priests and clerics, and "candidates for the priesthood" from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to

39

authorities, as part of a regular course of commercial conduct and particular commercial transactions and acts, constitutes an act or acts of concealment or obstructive conduct under Louisiana and federal statutory law, common law and customary international law.

85.     A special legal relationship existed between Plaintiffs and Defendant Holy See, in the nature of a fiduciary relationship, which relationship was carried out by and through priests, clerics and administrators under the direct and absolute control of Defendant Holy See, in their capacity as paid educators and/or counselors and recruiters of minor children in the private schools of the Roman Catholic Church in the United States.  The Defendant breached fiduciary duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states, including Louisiana and customary international law of human rights, including but not limited to:

a. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that its priests and clerics in those churches and schools were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

b. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

c. A duty to provide a reasonably safe environment at its institutions.

d. A duty to mandate safe policies and procedures for its institutions.

86.     Holy See knew that Morvant had a history of sexually abusing and exploiting children and was a danger to children before Morvant abused and exploited Plaintiffs.  Whether or not Morvant had a history of sexual abuse was a material fact to Plaintiffs and Plaintiffs relied on this non-disclosure.  Holy See intentionally did not disclose this fact to the then minor Plaintiffs in order to induce them to act on the misrepresentation to their detriment.  Plaintiffs relied upon this intentional non-disclosure.

87. Defendant Holy See, through its agents the Archdiocese and the Diocese, represented to Plaintiffs and their families that Morvant did not have a history of sexually abusing and exploiting children and that Morvant was not a danger to children. Holy See owed a duty of care to Plaintiffs because it knew or should have known that Morvant was a danger to children, and should have known that Morvant had molested children before he raped and molested Plaintiffs, and should have known that parents and children would place the utmost trust in Morvant. Holy See, through its agents the Archdiocese and the Diocese, failed to use ordinary care in making the representations or in ascertaining the facts related to Morvant's significant/lengthy history of sexually abusing and exploiting children. Holy See reasonably should have foreseen that its representations would subject Plaintiffs to the unreasonable risk of harm. Plaintiffs believed and justifiably relied upon Holy See's representations.

88. The actions of Defendant Holy See alleged herein in Paragraphs 75 - 87 proximately caused the incidents in question and the damages sustained by Plaintiffs.

### VIII. CAUSE OF ACTION AGAINST DEFENDANTS HOLY SEE AND THE ARCHDIOCESE AND ARCHBISHOP AYMOND AND THE DIOCESE AND BISHOP DESHOTEL

89. Plaintiffs allege that the Defendants herein have entered into a civil conspiracy to accomplish an unlawful purpose (namely, concealing the rape, molestation, sexual abuse and exploitation of children and the failure to report such abusive conduct to the authorities) and/or to accomplish a lawful purpose by unlawful means (namely, concealing their own negligence and breach of duty by the unlawful means of illegally failing to report such rape, molestation and abuse to the authorities). This combination represents a meeting of the minds on the object or course of action to accomplish the above objectives and constitutes a civil conspiracy. Numerous unlawful overt acts have been committed in furtherance of this combination; namely, the failure to report the numerous

41

separate instances of sexual misconduct Morvant in 1970, 1980, 1982, 1992 and thereafter as required by Louisiana's mandatory reporting statutes and customary international laws of human rights as well as the failure to report other predatory clerics and priests as required by federal and Louisiana's mandatory reporting statutes.  Numerous overt acts have been committed in furtherance of this civil conspiracy including overt acts prior to and after late 2016.  As a proximate result of this combination, Plaintiffs have suffered damages.

90.    Plaintiffs have also alleged that these Defendants, individually and collectively, have acted to conceal the cause of Plaintiffs' injuries, namely the Defendants' knowledge and negligence with regard to the rape, molestation, sexual abuse and exploitation of children by Morvant and others, as well as the negligence, fraud, and breach of fiduciary duty on the part of these Defendants in concealing their knowledge and negligence.  Each Defendant was knowledgeable of the existence of these claims.  Each Defendant used deception to conceal these claims and their breach of duty or the breach of duty of previous duly appointed governing officials in permitting the rape, molestation and abuse to occur.  Plaintiffs have reasonably relied on the Defendants' deception and Plaintiffs have been unable to discover that their claims against Defendants were concealed until after late 2016. Plaintiffs' ignorance of the facts concerning Defendants' knowledge and negligence was not willful, negligent or unreasonable.

91.    Plaintiffs allege several acts of fraud designed to conceal the wrongdoing and negligence of Defendants and the wrongdoing and negligence of previous duly appointed governing officials which occurred before and after the events giving rise to this litigation.  Specifically, Plaintiffs plead deceptive acts prior to 1970, in 1980 and 1982 and from 1992 to the present.  These deceptive acts had the purpose of concealing wrongdoing on the part of these Defendants until after late 2016.

92.     These Defendants have a fiduciary relationship with and a fiduciary duty to Plaintiffs. This fiduciary relationship gives rise to the duty on the part of these Defendants to act with the highest degree of trust and confidence towards Plaintiffs.  Defendants breached their fiduciary duty to Plaintiffs. This breach of fiduciary duty includes the duty to warn and disclose.

93.     Defendants have been negligent in their actions and have violated their duty to exercise reasonable care to protect Plaintiffs from the foreseeable risk of child rape, molestation and sexual abuse and exploitation by Morvant prior to 1970.

94.     Plaintiffs allege that the actions of these Defendants have been outrageous and have intentionally inflicted emotional distress upon Plaintiffs.

95.     Plaintiffs also allege that all Defendants acted in concert and are jointly and severally liable for all acts and/or omissions under the legal doctrines of conspiracy and concert of action as joint venturers, and as agents of these entities as these concepts are understood and provided for under the Article 2324(A) of the Louisiana Civil Code and Section 876 of the Restatement (Second) of Torts.  Thus, Plaintiffs seek damages from all Defendants *in solido*.

96.     The actions of Defendants alleged herein in  Paragraphs 89 - 95 proximately caused the incidents in question and the damages sustained by Plaintiffs.

## IX.  DAMAGES AND EXEMPLARY DAMAGES

97.     As a result of the incidents described herein, Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V have (a) incurred medical and psychological expenses in the past which were reasonable and necessary and in all reasonable probability will incur medical and psychological expenses in the future; (b) experienced pain and suffering in the past and in all reasonable probability will sustain pain and suffering in the future as a result of Plaintiffs' psychological injuries; (c) experienced mental anguish in the past and in all reasonable probability

will sustain mental anguish in the future; (d) suffered a loss of earnings and earning capacity in the past and in all probability will sustain such losses in the future; and (e) incurred many other damages and in all reasonable probability Plaintiffs' social and professional adjustment in the future will be severely impacted.  As a result of the above, Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V seek damages in the amount of $30,000,000.00.

## X. CLAIM FOR PRE-JUDGMENT AND POST-JUDGMENT INTEREST

98.     Plaintiffs claim interest in accordance with 28 U.S.C. § 1961 and any other applicable law.

## XI.  STATEMENTS TO THE COURT

99.     Plaintiffs plead that they did not know and could not have known of the claims against the Defendants for fraud, misrepresentation, negligence, and breach of fiduciary duty or the civil conspiracy that was conceived and executed by all Defendants and that their ignorance was not willful, negligent or unreasonable, thus preventing the running of liberative prescription until after late 2016.

100.    Plaintiffs plead that from the time of the incidents in question and through the present time they have suffered from a disability due to the effect of the continuous emotional and psychological condition that derived from Defendants' actions and has prevented them from suing or acting against the Defendants as plead herein, thus preventing the running of liberative prescription until late, 2016.

101.    Plaintiffs plead fraud and concealment of this fraud on the part of Defendants, where such acts of fraud and concealment by Defendants effectually prevented Plaintiffs from availing themselves of their causes of action, thus preventing the running of liberative prescriptions as to all claims against all Defendants until after late, 2016.

44

102.   Plaintiffs have plead concealment of facts under Defendants' control, where such acts of concealment of facts by Defendants effectually prevented Plaintiffs from availing themselves of their causes of action, thus preventing the running of liberative prescriptions as to all claims against all Defendants until after late, 2016.

103.   Plaintiffs have plead concealment of fraudulent statements and other misrepresentations known to Defendants, where such acts of concealment of misrepresentations by Defendants effectually prevented Plaintiffs from availing themselves of their causes of action, thus preventing the running of liberative prescriptions as to all claims against all Defendants until after late, 2016.

104.   Plaintiffs have plead breach of fiduciary duty, including the duty to disclose, and the use of deception to conceal Plaintiffs' case against all Defendants for breach of the duty of care, where such acts of breach of fiduciary duty and deception by Defendants effectually prevented Plaintiffs from availing themselves of their causes of action, thus preventing the running of liberative prescriptions as to all claims against all Defendants until after late, 2016.

105.   Plaintiffs have plead a civil conspiracy to conceal criminal acts, to conceal the commission of criminal acts, to conceal negligence by unlawful means, to conceal fraud, to conceal the breach of the duty of trust and confidence, and to conceal the use of deception to avoid claims until the claims prescribed by illegal means, where the acts and omissions were perpetrated and committed by an agreement of the Defendants and resulted in Plaintiffs' injury.

106.   Plaintiffs allege that the actions of all Defendants, because of their cover-up, conduct, statements and promises, preclude them from claiming the exception of prescription to any of Plaintiffs' claims.  Plaintiffs thus plead the doctrine of Equitable Estoppel.

107.   Plaintiffs plead delayed discovery of the harm caused by the sexual abuse and

exploitation by Morvant and the delay in treatment despite the exercise of reasonable diligence on Plaintiffs' part, due to Plaintiffs' loss of memory of the specific acts of sexual abuse, thus preventing the running of liberative prescriptions until after late, 2016.

## XII.  COMPLIANCE WITH LRS 9:2800.9

108.    Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V will comply with the provisions of LRS 9:2800.9.  In accordance with LRS 9:2800.9, the attorney for Plaintiffs and a licenced mental health practitioner will execute separate certificates of merit for Defendants Holy See (Vatican City State), The Roman Catholic Church of the Archdiocese of New Orleans, Most Rev. Gregory M. Aymond, as Archbishop of The New Orleans Archdiocese, The Society of the Roman Catholic Church of the Diocese of Lafayette, and Most Rev. J. Douglas Deshotel, DD as Bishop of The Roman Catholic Church of the Diocese of Lafayette.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V pray that Defendants appear and answer herein and that there be judgment against Defendants *in solido* for a sum of money for damages described herein, for cost of suit, for interest from the date of the incident, and such other relief to which John Doe I, John Doe II, John Doe III, John Doe IV and John Doe V may be justly entitled.


Respectfully submitted,

**ANDRE LAPLACE**

By:   /s/ Andre Laplace
          Andre Laplace, La. Bar #08039
          2762 Continental Drive, Suite 103
          Baton Rouge, La.  70808
          (225) 924-6898
          (225) 924-6877 (FAX)

**FELECIA Y. PEAVY, ESQ.**

By: _____/s/ Felecia Y. Peavy_____
    Felecia Y. Peavy
    Texas Bar No. 15698820
    P.O. Box 3464
    Houston, Texas 77253
    (713)222-0205

**ATTORNEYS FOR PLAINTIFFS**